IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

GNILA M. OCHOA,

                Plaintiff,                         CV-08-1415-ST

         v.                                FINDINGS AND
                                                  RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

        Plaintiff, Gnila M. Ochoa ("Ochoa"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her application for Supplemental

1 - FINDINGS AND RECOMMENDATION

Security Income ("SSI") under Title XVI and Disability Insurance Benefits ("DIB") under Title

II of the Social Security Act ("Act"), 42 USC §§ 401-33.  This court has jurisdiction to review

the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  For the reasons set

forth below, the Commissioner's decision should be affirmed.

## ADMINISTRATIVE HISTORY

Ochoa filed for SSI and DIB on October 31, 2005, alleging a disability since January 1,

2003, due to seizures, panic attacks, anxiety attacks, restless leg syndrome, nosebleeds,

migraines, diabetes, depression, and morbid obesity.  Tr. 63-65, 90-91, 446-49.[1]  Her date last

insured is September 30, 2007.  Tr. 15.  After her applications were denied initially and on

reconsideration, Ochoa timely requested a hearing.  Tr. 10, 40-45, 450-67.  On February 26,

2008, a hearing was held before Administrative Law Judge ("ALJ") Linda R. Haack.  Tr. 468-

505.  The ALJ issued a decision on May 7, 2008, finding Ochoa not disabled.  Tr. 15-27.  The

Appeals Council denied review on October 29, 2008 (Tr. 5-7), making the ALJ's decision the

Commissioner's final decision.

## BACKGROUND

At the time of the ALJ's decision, Ochoa was age 34 and morbidly obese.  Tr. 18, 90.

She did not complete high school and has been employed only sporadically as a warehouse

worker, child care worker, cashier, and a caregiver at an assisted living facility.  Tr. 91, 315, 473.

In January 2006, Ochoa reported that her day typically follows a routine.  Each morning

she walks her daughter one block to school, makes coffee, cleans up her kitchen, watches

television, talks on the phone, and then has restless, interrupted sleep throughout the morning

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on October 6, 2009 (docket #18).

2 - FINDINGS AND RECOMMENDATION

and early afternoon.  Tr. 110.  In the afternoon Ochoa walks to pick up her daughter from school, fixes her a snack, tidies the house, helps her daughter with homework, sometimes goes to the store, makes dinner, bathes her daughter, and puts her to bed.  *Id.*  She stays up late watching television and her nights are largely sleepless.  *Id.*  Ochoa's account of her routine is corroborated by the January 2006 report of her cousin Cory Stevenson.  Tr. 121.

Ochoa also cares for two dogs with the help of her children.  Tr. 111.  She washes the dishes, sweeps, vacuums, and does the laundry on a daily basis, and mops once per week. Tr. 317.  She goes "out in public every other day" and to coffee or dinner once per month, but friends and family must often deceive her in order to get her to leave the house.  Tr. 113-15. According to her cousin, Ochoa does not go out alone "with the exception of picking up her daughter."  Tr. 124.

In April 2004, Ochoa reported that "[s]he is very anxious and stays at home most of the time because she does not like being around people."  Tr. 270.  As she explained then, she feels embarrassed by her obesity and that she believes this precipitates her discomfort in social settings.  Tr. 275.  Furthermore, in 2004, Ochoa stated that "that taking a Lorazepam prior to encountering the social situations almost completely eliminates [her] anxiety response to them." Tr. 275.  In April 2006, she reported that when she is around other people, she feels sweaty, shaky, and  has problems breathing."  Tr. 316.  Ochoa also said that she cannot take a bus "because of the people" and "can't work because I can't be around people because of my anxiety." Tr. 315, 317.  Nevertheless, in that same interview, she stated that during her most recent employment in 2005, "she got along with her coworkers and supervisors" and was discharged because she "wasn't fast enough."  Tr. 315.

3 - FINDINGS AND RECOMMENDATION

In March 2007, Ochoa visited with Linda Lallande, F.N.P., and related that she had been pressured to participate in a friend's wedding, started to sweat profusely and became embarrassed and humiliated.  Tr. 373.  She also related that the Department of Human Services wanted her to participate in a support group, but that she felt unable to go out in public.  *Id.*

Ochoa's mental functioning was evaluated in an intellectual assessment on April 15, 2006, by Gregory A. Cole, Ph.D. (Tr. 314-20), and in a learning disability assessment on April 12, 2007, by Jim Rowley, Psy.D (Tr. 349-57).  In a series of tests, Dr. Cole found that Ochoa had a Performance IQ of 81, which corresponds to the 10th percentile, and that her scores on a number of tests "place her in the borderline level of intellectual functioning."  Tr. 318.  He diagnosed Ochoa with major depression and a panic disorder without agoraphobia, assessed a GAF score of 55, and wrote that:

> Results of this evaluation indicated that the client exhibited some problems in the areas of attention and concentration.  She also was noted to have slightly below average immediate memory capabilities, and average delayed memory capabilities.  She also tends to give up easily on tasks, and her overall pace on tasks was observed to be slow.  The client was able to sustain simple routine tasks, and only mild problems completing a simple multiple-step task were observed.  From the results of the current evaluation, if the client pursues a vocational placement in the near future, then it is presumed that her level of anxiety and intellectual deficits would be the primary factors which would impact her overall level of vocational success.

Tr. 319.

Dr. Rowley conducted a number of psychological tests and found that Ochoa's overall cognitive functioning is her Performance IQ score of 90, which corresponds to the 25th percentile.  Tr. 352.  He also determined that Ochoa suffers from anxiety disorder and assessed her GAF as 58.  Tr. 354.  Testing Ochoa's memory, he found that "she will have greater

4 - FINDINGS AND RECOMMENDATION

difficulty performing tasks that require her to take in, hold, and then manipulate or process verbal information than would her same age peers." Tr. 353.  Dr. Rowley suggested that "[t]o aid her memory and improve recall, [Ochoa] will want to purchase a small portable audio recorder and several blank tapes.  [She] will want to tape all important instructions and directives from case managers, other DHS employees, and employers."  Tr. 357.

    In addition to intellectual deficits, Ochoa has a history of depression.  In June 2005, Ochoa visited her primary care physician, Shawn H. Blanchard, M.D., and discussed her mental status and the fact that her 15 year-old son had run away from home.  Tr. 257.  Dr. Blanchard opined that Ochoa suffered from depression and prescribed Wellbutrin.

    Ochoa has also had difficulty sleeping for a number of years.  In April 2004, Dr. Blanchard noted that Ochoa's sleep schedule "continues to be quite erratic" and that she stays up all night and sleeps sporadically throughout the day.  Tr. 270.  In January 2005, Dr. Blanchard noted that recently Ochoa "does not have any nightmares and is sleeping well."  Tr. 262.  After again having difficulty sleeping, however, in the fall of 2005, Ochoa engaged in a sleep study.  Tr. 241.  As a result, Kyle Johnson, M.D., a sleep disorder specialist, diagnosed her with mild obstructive sleep apnea and a number of other sleep conditions and found that she had "significant problems of sleep-disordered breathing."  *Id.*  Dr. Johnson prescribed a CPAP machine to assist Ochoa with her breathing while sleeping, especially at night.  Tr. 116.  In January 2006, despite use of the CPAP and advice about how to train her body to sleep at night, Ochoa "continue[d] to say that it is easier for her to sleep during the day when her children are gone and the house is quiet."  Tr. 403.  In February 2008, she testified that she had difficulty

5 - FINDINGS AND RECOMMENDATION

falling asleep at night, and once asleep, will hallucinate the sound of phones ringing or knocking

on the door, and wake up.  Tr. 483-84.

In addition to her sleeping problems, Ochoa has a history of "diabetes which is not well-

controlled."  Tr. 265.  In November 2003, Ochoa inquired about diabetes education, but did not

attend the classes provided by her doctor's office.  Tr. 270.  In April 2004, when she again

inquired about classes, Dr. Blanchard referred her to a dietary specialist, Kylie Smith M.S., who

wrote:

> My assessment of her diet is that it tends to be quick meals, and I am not
> sure if it is related to just her insomnia, the exhaustion that she has,
> depression, or her hypothyroidism, but it does not seem like she is making
> a wholehearted effort to do things for herself, and preparing meals for
> herself seems to be more of a burden for her.

Tr. 273.

In October 2007, Nurse Lallande noted that Ochoa's diabetes continued to be poorly

controlled through the use of oral medication and recommended that she start insulin.  Tr. 360.

Ochoa was opposed to the idea.  *Id.*  Nurse Lallande also noted that Ochoa was no longer

walking anywhere on a regular basis and "strongly encourage[d] walking 20 min[utes] every

day."  *Id.*  In March 2004, Julie Crawford, M.D., noted that Ochoa had "poor compliance with

medications" and she "is thought to have possible limited insight into her diseases, and therefore,

lacks the understanding of the importance to take her medications and to follow through with her

diabetic teaching and recommendations for her other medical issues."  Tr. 279.

Among Ochoa's other medical issues is restless leg syndrome.  Tr. 293.  She says that

"she tries to stop her leg or hand movement and is not always able to do so."  Tr. 275.  "She

describes it going on for hours at a time, day or night whether or not she is tired or at rest.  She

states that she can have a child on her lap who will be bounced off by her leg movement."  *Id.*

Ochoa believes she has an epilepsy disorder due to lightheadedness, sweatiness, and

dizziness which can proceed a blackout.  Tr. 274-74.  In February and April of 2004, Ochoa was

evaluated at the OHSU Epilepsy Clinic.  Tr. 274.  Therese Landry, R.N., F.N.P., summarizing

the clinic's findings, wrote that "[t]hese events do not appear to be epileptic seizures.  They bear

characteristics of other conditions confronting [Ochoa], namely panic attacks or hypoglycemia or

hypotensive episodes."  Tr. 275.  She also noted that Ochoa's EEG during waking hours was

normal.  Tr. 276.  In March 2004, Dr. Crawford noted that Ochoa's "MRI from February 2004

showed an unremarkable brain with no evidence of a seizure etiology."  Tr. 279.

Despite Ochoa's issues, she occasionally provides childcare for a friend.  Ochoa has not

worked for a business since 2003 or 2004, but she testified at the hearing that since 2004, she

watches a friend's baby in exchange for cash or payment of debts for four to six hours per day,

sometimes as often as three or four times per week.  Tr. 474.

## DISABILITY ANALYSIS

The Act provides for payment of DIB to people who have contributed to the Social

Security program and who suffer from a physical or mental disability.  42 USC § 423(a)(1).  In

addition, under the Act, SSI may be available to individuals who are age 65 or over, blind, or

disabled, but who do not have insured status under the Act.  42 USC § 1382(a).  In construing an

initial disability determination, the Commissioner engages in a sequential process encompassing

between one and five steps.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140

(1987).

7 - FINDINGS AND RECOMMENDATION

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If the adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1566, 416.966..

## ALJ'S FINDINGS

At step one, the ALJ concluded that Ochoa has not engaged in substantial gainful activity since the alleged onset date of January 1, 2003. Tr. 17.

At step two, the ALJ determined that Ochoa suffers from the severe impairments of hypothyroidism, depression, and panic attacks. Tr. 17-19.

At step three, the ALJ concluded that Ochoa does not have an impairment or combination of impairments that meets or equals any of the listed impairments (Tr. 19-21) and has the RFC to "perform light duty work . . ., except that during an eight-hour day, she could sit, stand, and walk for only two hours at a time for a total of six to eight hours." Tr. 21. She also found that Ochoa has no limitations regarding manipulation, vision, communication or postural activities, but requires work instructions to be given in both oral and written form with written or taped instructions to assist her memory while working. *Id*. In addition, Ochoa "experiences moderate limitations in working with co-workers, in interacting with the general public, in setting independent goals, and making plans" and "should avoid concentrated exposure to hazardous conditions." *Id*.

Based on the above limitations, the ALJ concluded at step four that Ochoa cannot perform any past relevant work (Tr. 26) and at step five that she can perform work as a light janitorial worker, packager/sorter, or products assembler. Tr. 26.

9 - FINDINGS AND RECOMMENDATION

Accordingly, the ALJ concluded that Ochoa was not disabled.  Tr. 27.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance.  *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005). This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). However, it may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## FINDINGS

Ochoa argues that the ALJ erred by:  (1) rejecting her testimony without providing clear and convincing reasons supported by substantial evidence; (2) failing to address her cousin's statement; (3) rejecting the opinions of Nurse Lallande; (4) failing to follow SSR 96-8p when formulating her RFC; (5) making findings at step five based on a deficient RFC; and (6) failing to address evidence about the number of jobs.

## I.    Ochoa's Testimony

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  First, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter*, 504 F3d at 1036.  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  *Id*.  At the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." *Id*.

> In order to find [the claimant]'s testimony regarding the severity of h[er] pain and impairments unreliable, the ALJ was required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) . . . . The ALJ may consider many factors in weighing a claimant's credibility, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  If the ALJ's finding is supported by substantial evidence, the court "may not engage in second-guessing."

*Tommasetti v. Astrue*, 533 F3d 1035, 1039 (9th Cir 2008) (some internal citations omitted).

First, Ochoa argues that the ALJ erred by concluding that sporadic work history prior to the alleged onset date "raises a question as to whether [her] continuing unemployment is actually due to medical impairments."  Tr. 23.  This is not a particularly persuasive reason to discredit Ochoa since her work history could be entirely consistent with her alleged symptoms and

limitations.   However, the fact that the ALJ improperly considered Ochoa's sporadic work

history does not eviserate her entire credibility assessment.  *Batson*, 359 F3d at 1197.  In order to

assess whether the entire credibility assessment is improper, the court turns to the ALJ's other

reasons for discrediting Ochoa's testimony.

Second, Ochoa contends that the ALJ erred in discrediting her testimony because "the

treatment has been essentially routine and/or conservative in nature, and when [Ochoa] remains

compliant with her medical regimen it is generally successful in controlling these symptoms."

Tr. 23.  According to Ochoa, this is not a legitimate reason because the ALJ did not explain what

she meant and, in particular, what other additional treatment would be effective.  However, the

ALJ gave the example that after being diagnosed with diabetes, Ochoa failed to attend education

classes about how to control her diabetes because she was too busy.  *Id*.  In addition, the ALJ

referred to "notations throughout the record that [Ochoa] repeatedly failed to comply with her

doctor's directions to monitor her blood sugars, modify her diet and get more exercise."  *Id*.  The

record supports the ALJ's reasoning.  When Ochoa eventually attended education classes about

her diabetes, the specialist who taught the class wrote that Ochoa "does not seem like she is

making a wholehearted effort to do things for herself, and preparing meals for herself seems to

be more of a burden for her."  Tr. 273.  Moreover, the record is replete with references to poorly

controlled diabetes.  Similarly, Ochoa herself observed that "taking a Lorazepam prior to

encountering the social situations almost completely eliminates her anxiety response to them."

Tr. 275.  A failure to follow a prescribed course of treatment is a legitimate factor to consider

when weighing credibility.  *Tommasetti*, 553 F3d at 1039-40; SSR 96-7p, 1996 WL 374186

(July 2, 1996), *7.

12 - FINDINGS AND RECOMMENDATION

Third, Ochoa argues that the ALJ erred in discrediting her testimony about her daily activities because the activities "cannot be objectively verified." Tr. 23. Ochoa ignores, however, the two additional reasons given by the ALJ to discredit Ochoa's testimony about her daily activities. After first noting the impossibility of verifying the activities, the ALJ stated that "it is difficult to attribute that degree of limitation to [Ochoa's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." *Id*. In addition, the ALJ found that, "as discussed elsewhere in this decision, [Ochoa] has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id*.

Elsewhere in the decision, the ALJ discussed that Ochoa provided childcare for a friend occasionally. At the hearing, Ochoa testified that she provided childcare "[s]ometimes four hours just for the baby, sometimes maybe six [hours] . . . sometimes three to four days a week." Tr. 474. Ochoa also raises her three children on her own and "washes the dishes, sweeps, vacuums, and does the laundry, on a daily basis, and she mops once a week." Tr. 317. This evidence supports the ALJ's conclusion that Ochoa testified to a degree of incapacity incompatible with her activities of daily living and refutes Ochoa's final argument that these activities in her home do not undermine her credibility.

Thus, even if one reason does not withstand scrutiny, the ALJ gave other specific, clear and convincing reasons supported by substantial evidence for discrediting Ochoa's testimony.

## II.    Lay Witness Testimony

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless she gives reasons for the rejection that are germane to each witness.

13 - FINDINGS AND RECOMMENDATION

*Stout v. Comm'r Soc. Sec. Admin.*, 454 F3d 1050, 1053 (9th Cir. 2006).  A medical diagnosis, however, is beyond the competence of lay witnesses.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir. 1996).  A legitimate reason to discount lay testimony is a conflict with medical evidence. *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir. 2001).

The ALJ failed to specifically address a questionnaire provided by Ochoa's cousin, Cory Stevenson.  Stevenson's evidence generally corroborates Ochoa's testimony about her daily routine, as well as noting that Ochoa sweats and feels nervous around unfamiliar people. "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  *Stout*, 454 F3d at 1056.

As discussed below, the key problem with Ochoa's disability claim is the lack of objective medical evidence to support her purported disabilities and her failure to follow medical advice.  Even if all of her reports about her daily activities are completely true, no reasonable ALJ could have concluded that Ochoa would be disabled under the Act.  Therefore, the ALJ's error in failing to address the Stevenson testimony is harmless.

## III.    Nurse Practitioner's Opinion

On December 20, 2007, Nurse Lallande completed a form provided by Ochoa's attorney concerning Ochoa's ability to perform work-related activities.  Tr. 438-45.  Among other things, she wrote that Ochoa's "somnolence and fear are more significant than [her] physical problems" and that her fear "to leave home creates extreme stress, diaphoresis and panic attacks."  Tr. 444. She opined that Ochoa was "incapable of even 'low stress' jobs, "can barely leave home to go to

the grocery store," would need to lie down four times during a work shift, and had been "unable

to work since [the] end of 2001 due to sweating."  Tr. 441-42, 445.  The ALJ declined to "afford

Nurse Lallande's opinion significant weight."  Tr. 25.

Acceptable medical sources are licensed physicians, psychologists, optometrists,

podiatrists, and qualified speech-language pathologists.  20 CFR § 416.913(a).  A nurse

practitioner is not considered an acceptable medical source.  *Id*.  Consequently, a nurse

practitioner's opinion is not a medical opinion.  20 CFR § 416.927(a)(2).  Nevertheless, a nurse

practitioner's opinion may be used to evaluate the severity of a claimant's impairment and how it

affects his or her ability to work.  20 CFR. § 416.913(d)(1).  In order to reject the testimony of a

nurse practitioner, an ALJ must gives germane reasons for the rejection.  *Stout*, 454 F3d at 1053.

First, Ochoa takes issue with the ALJ's explanation that "Nurse Lallande's opinions

would carry less weight simply because she had been the claimant's treating source for less than

six months, and had apparently seen the claimant only five or six times."  Tr. 25.  According to

Ochoa, Nurse Lallande saw Ochoa seven times over a period of 10 months.  However, Ochoa's

citations to the record reveal that Nurse Lallande saw Ochoa six times between July and

December of 2007.  Whether Nurse Lallande saw Ochoa six or seven times over a period of five

months or 10 months, however, is not of great consequence.  In either event, Nurse Lallande's

course of treating Ochoa took place over a relatively short period of time compared to, for

example, Dr. Blanchard, who was Ochoa's primary care physician for a period of least 32

months.  Tr. 240, 302.

Ochoa also contends that the ALJ erred by rejecting the testimony of Nurse Lallande

because "the bulk of her opinion appears to be based on [Ochoa's] subjective reports and

15 - FINDINGS AND RECOMMENDATION

medical notes from other sources, is not well supported by medically acceptable clinical and/or laboratory diagnostic studies, and is inconsistent with other substantial evidence in the record–including her own clinical notes." Tr. 25.  The ALJ adds in a footnote that "she described many limitations that had no basis in the medical evidence" and that "her characterization of 'sweating' (or diaphoresis, as she refers to it) as a disabling symptom simply does not make sense." *Id* n5.

When asked "[d]oes the claimant have one or more impairments with a need for changes in position or posture more than once every two hours," Nurse Lallande responded that her "legs start twitching - develops tremor of hands - becomes diaphoretic & must reposition - get up and walk around." Tr. 441.  This court agrees with the ALJ that this answer makes little sense.  No evidence in the record supports the conclusion that changes in posture affect Ochoa's hand tremors to the extent she experiences them, much less that sweatiness is an impairment requiring Ochoa to change position or posture to alleviate it.  Moreover, the record contradicts Nurse Lallande's answer for restless leg syndrome.  Ochoa described her restless leg syndrome as "going on for hours at a time, day or night whether or not she is tired or at rest." Tr. 275.

More importantly, the ALJ correctly assessed that Nurse Lallande's diagnoses are not supported by or contradict other sections of the record.  For example, Nurse Lallande lists two of Ochoa's diagnoses as Post Traumatic Stress Disorder ("PTSD") and agoraphobia. Tr.  439.  Yet both examining psychologists found that Ochoa does not suffer from agoraphobia and that she is not presently diagnosed with PTSD, although it may be a possible diagnosis in the future. Tr. 319, 354.

16 - FINDINGS AND RECOMMENDATION

Because the ALJ gave sufficient germane reasons to accord Nurse Lallande's opinion less than significant weight, she committed no legal error in that regard.

IV.   **Formulation of RFC**

A claimant's RFC is the most she can do considering her impairments and limitations. SSR 96-8p, 1996 WL 374184, *4.  "[A]n RFC assessment is the adjudicator's ultimate finding based on a consideration of . . . all the . . . evidence in the case record about what an individual can do despite his or her impairment(s)."  SSR 96-5p, 1996 WL 374183, *4 (July 2, 1996).

Ochoa argues that the ALJ erred in formulating the RFC because the use of a tape recorder precludes the possibility of substantial gainful activity and because the ALJ failed to properly consider Ochoa's fatigue, depression, obesity, finger numbness, anxiety, and the side effects of Vicodin.

///

///

A.   **Memory Assistance Limitation**

The ALJ's formulation of Ochoa's RFC contained a limitation that "requires that her work instructions be given in both oral and written form, and that she is provided written or taped instructions to assist her memory while working."  Tr. 21.  When the ALJ posed this limitation to the Vocational Expert ("VE"), the VE testified that Ochoa would be able to do light janitorial work and small products assembly.  Tr. 500-01.  On cross examination, Ochoa's attorney asked,

> Well, if we didn't have the tape recorder or someone to listen to, to refresh their memory then the other part of the Judge's element is instruction orally.  Wouldn't it be in effect as something of a special accommodation

>   to have somebody come around to reinstruct you or have you replay a tape
>   to remind you of what you're supposed to be doing next?

Tr. 502.

The VE responded that "[i]t would depend how frequently that was done.  If it became excessive I think then that might be out of the ordinary and considered an accommodation."  *Id.*

Ochoa argues that due to this memory assistance limitation, Ochoa can only work in a highly structured environment under 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(F).  However, no law supports Ochoa's contention.  Indeed, many people with all levels of intelligence and memory rely on written notes or electronic devices to remind them what to do and when to do it.  This court is not persuaded that Ochoa's memory limitation makes her unable to engage in substantial gainful activity, or that the ALJ's formulation of the RFC is somehow deficient because of Ochoa's memory limitation.

///

///

## B.    <u>Other Conditions</u>

Ochoa also argues that the ALJ failed to address Ochoa's fatigue in her formulation of the RFC.  According to Ochoa, her sleep apnea, depression, and obesity result in fatigue and cause her to need to take naps during the day.  Ochoa argues that no evidence supports the ALJ's assertion that "[i]f the claimant were to comply with the directions of her treating medical sources, she would in all likelihood not experience significant daytime somnolence."  Tr. 26.

In January 2006, a specialist at the OHSU sleep disorders clinic advised Ochoa that she would sleep better if she used her prescribed CPAP machine all night long and if she did not

watch TV in bed.  Tr. 403.  In October 2006, Ochoa continued to have difficulty sleeping, but told her doctor that she was "not using CPAP consistently."  Tr. 385.  In December 2006, she told her doctor that "[s]he has been watching the news before bedtime."  Tr. 380.  In addition, many medical providers encouraged Ochoa to exercise more frequently which she has not done.  Accordingly, the ALJ did not err in failing to include a fatigue limitation in her formulation of the RFC.

Ochoa contends the ALJ should have also included an obesity limitation in her formulation of the RFC.  Ochoa contends that obesity can have a litany of negative effects on a person's health, which the ALJ should have addressed.  While obesity undoubtedly causes many negative health conditions, an ALJ is not required to address all of them unless the record contains evidence that the claimant experiences the condition as a result of his or her obesity.  However, the ALJ did include a limitation to take account of Ochoa's obesity:  "While the claimant's low average intelligence and obesity are not in themselves severe impairments, the undersigned will consider their effects in formulating the claimant's residual functional capacity."  Tr. 18.  The RFC then included the limitation that "during an eight hour day, she could sit, stand, and walk for only two hours at a time for a total of six to eight hours."  Tr. 21.  Although two hours exceeds what Ochoa claims she is able to do, the ALJ gave clear and convincing reasons for discrediting Ochoa's testimony, as discussed above.  Accordingly, the ALJ did not err in the limitation in the RFC regarding Ochoa's obesity.

Ochoa also argues that the ALJ erred in failing to consider her anxiety.  To the contrary, the ALJ did consider Ochoa's anxiety by asking the VE "to assume that she has moderate limits on working with the general public and co-workers."  Tr. 500.  The ALJ also included "panic

attacks" as a severe impairment in the decision.  Tr. 17.  Moreover, Ochoa told Dr. Cole that at

her last job "she got along with her coworkers and supervisors" and told Nurse Landry that "she

has found that taking a Lorazepam prior to encountering the social situations almost completely

eliminates her anxiety response to them."  Tr. 275, 315. This testimony detracts from her claim

of any serious limitation due to anxiety.  Thus, the ALJ did not err.

Ochoa further argues the ALJ erred by not addressing Ochoa's depression, migraines,

and drowsiness as a side effect of Vicodin.  However, as with virtually all of Ochoa's problems,

these maladies cannot be, and have not been, objectively verified.  A reviewing court need not

reverse where "the ALJ took into account those limitations for which there was record support

that did not depend on the claimant's subjective complaints," but failed to perform a function-

by-function assessment of each ailment alleged.  *Fleming v. Astrue*, 303 Fed Appx 546, 550 (9th

Cir 2008).  Nothing in the record supports Ochoa's depression, migraines, or drowsiness that

does not depend on her subjective complaints.  Therefore, the ALJ did not err by failing to

include an RFC limitation for every subjective complaint that Ochoa has made over the years,

including depression, migraines, and drowsiness related to Vicodin.

For the above reasons, this court finds that the ALJ's formulation of Ochoa's RFC was

proper and supported by substantial evidence.

## V.    <u>Number of Jobs</u>

Finally, Ochoa contends that the ALJ ignored  the documentation she submitted

regarding the lack of data for how many jobs exist in the regional and national economies.

According to a letter from a representative of the U.S. Dept. of Labor, it "is not aware of any

data source or methodology for reliably determining the number of jobs by DOT code."  Tr. 172.

Ochoa contends the letter is "significant probative evidence" which the ALJ improperly ignored.

"Whether there are a significant number of jobs a claimant is able to perform with his

limitations is a question of fact to be determined by a judicial officer."  *Martinez v. Heckler*, 807

F2d 771, 775 (9th Cir 1986).  The VE testified that he was familiar with "the existence of jobs in

this geographical area and in the national economy."  Tr. 498.  Based on the VE's testimony, the

ALJ properly found that sufficient jobs existed.  Thus, the ALJ was not required to address the

documentation submitted by Ochoa in her decision.

///

///

///

///

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be affirmed.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due June 15, 2010.  If no objections are filed, then the Findings and Recommendation

will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

DATED this 27th day of May, 2010.

21 - FINDINGS AND RECOMMENDATION

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

22 - FINDINGS AND RECOMMENDATION